UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| **RONALD F. EDWARDS,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action Number |
| vs. | ) | **3:06-cv-2296-UWC** |
| | ) | |
| **NORTHWEST SHOALS** | ) | |
| **COMMUNITY COLLEGE,** | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION
GRANTING PARTIAL SUMMARY JUDGMENT FOR DEFENDANT**

Plaintiff Dr. Ronald F. Edwards ("Edwards") brings this action alleging that his employer, Northwest Shoals Community College ("NWSCC"), discriminated against him in violation of the Americans with Disabilities Act ("ADA") by failing to provide reasonable accommodations and by retaliating against him for engaging in protected activity. *See* 42 U.S.C. § 12101 *et seq*. Additionally, Edwards brings a state disability discrimination claim pursuant to Alabama Code § 21-7-1.

Presently before the Court is NWSCC's motion for summary judgment on all claims. (Doc. 20 .) After careful consideration of all relevant materials, the Court concludes that Defendant's motion for summary judgment is due to be granted, in part, and denied, in part.

## I.  PLAINTIFF'S DISABILITIES

Since 1992, Edwards has worked as a professor at NWSCC, where he teaches speech.  Edwards has vison problems that cause him to see six images in his right eye and four in his left.  He has problems seeing in low light and his vision is correctable only to 20/60.

Edwards also has a hearing impairment.  As far back as 1995, Edwards complained to the administration about students entering parking lots of campus buildings playing car stereos so loud that the music could be heard inside the buildings.  According to Edwards, the music caused his body to shake.  After the problem persisted for approximately three weeks, he suddenly awakened one morning suffering from a severe headache and dizziness.  Edwards sought treatment and was diagnosed as suffering from hearing loss caused by noise exposure.[1]  Because of the hearing loss, he occasionally wears hearing aids.  Even under the best conditions, however, Edwards rates his level of understanding speech at 72%.

As a result of his hearing problems, Edwards also suffers from severe motion sickness, constant vertigo, and constant nausea.  Because of these conditions, along with his vision problem, he must drive very slowly.  When he exercises outdoors, he must stay close to home in case he falls.  Indeed, he testified that he falls more frequently than the average person.  Finally, he sometimes suffers from vomiting episodes.

---

[1] While Edwards blames NWSCC for his hearing loss, he has not brought any claims seeking damages for his hearing loss. (*See* Doc. 21 at Ex. 6, Edwards Dep. at 108.)

## II. STATE AND FEDERAL LIMITATIONS PERIODS

Edwards complains of numerous incidents where NWSCC allegedly failed to provide reasonable accommodations. According to Edwards' brief, he repeatedly complained about these incidents from October 3, 1995 through June 21, 1999.[2]  (Doc. 23, Pl.'s Br. at 8.)  Then, in 2000, he asked to be allowed to use the fitness center after hours because he could not tolerate the noise during normal hours.  This request was denied.

The problem with these incidents is that they occurred outside the state statute of limitations period.  While the state disability statute does not specify what limitations period applies, the Court finds that the two-year statute of limitations period for personal injury governs.  *See*  Ala. Code § 6-2-38(1); *see also Everett v. Cobb County Sch. Dist.*, 139 F.3d 1407, 1410 (11th Cir. 1998).  Inasmuch as Edwards filed this action on October 20, 2006, the statute of limitations bars any state law disability claims for incidents that occurred prior to October 20, 2004.

Additionally, these same incidents are untimely under the ADA because Edwards did not file his ADA EEOC charge within 180 days of the alleged unlawful employment

---

[2]  Edwards complains of incidents that arose on or around October 3, 1995; November 1, 1995; July 2, 1996; July 14, 1996; September 12, 1996; May 30, 1998; September 13, 1998; and June 21, 1999.  (Doc. 23, Pl.'s Br. at 6-8.)

practices. *See* 42 U.S.C. § 2000e-5(e)(1).[3]

In the fall of 2005, however, approximately five years after the fitness center incident, Edwards began complaining about class size and a requirement that he travel to another campus for classes. These more recent claims are timely under the Alabama statute because they arose after October 20, 2004. With respect to the federal claims, he may pursue such claims as they relate to alleged discrimination that occurred within 180 days prior to June 22, 2006, the date he filed his EEOC charge. Accordingly, any alleged discrimination that occurred after December 24, 2005 is actionable under the ADA.

### III.  2005 - 2006 REASONABLE ACCOMMODATION & RETALIATION CLAIMS

In early September 2005 the NWSCC administration had some concerns about maintaining class size at the school in order to reduce costs. Apparently, Edwards' class size was increased because of these administrative concerns. According to Edwards, the additional students amounted to an increase in class size of fifty percent, from fifteen students to thirty.

Shortly after the semester started, Edwards was called into a meeting by several administrators who expressed concerns about the number of students who had dropped his courses. Additionally, the administrators indicated that some students complained

---

[3] It appears from the record that NWSCC addressed some of Edwards' complaints and provided certain accommodations. Because these early claims are untimely, this Court does not reach the issue of whether those accommodations were "reasonable" as defined in the ADA.

Edwards was rude. Several weeks later Edwards was called into a meeting by the administration concerning a student complaint about Edwards' classroom cell phone policy and his purported banging on the desk when attempting to enforce the policy.

At some point later, Edwards met with Dr. Humphrey Lee, who was the NWSCC President. During this meeting, Edwards complained about a course load increase and the requirement that he travel to the "Phil Campbell" campus. According to Edwards, he also produced documents from his physicians documenting his impairments.[4] When Lee later requested another meeting, Edwards arrived at the scheduled time and waited outside Dr. Lee's office for over one hour and fifteen minutes. During that time, Edwards heard laughing coming from inside the office. Because Edwards was scheduled to teach, he left before meeting with Lee. According to Edwards, he and Lee were scheduled to meet again, but Lee forgot. Although Lee promised to schedule a second meeting, he never made the arrangements.[5]

On November 7, 2005, Edwards memorialized his discussion with Lee in a letter. In that letter he recounted requesting a quiet classroom, office and working environment. He goes on to say that the classroom had been "almost tolerable until the class load was increased by more than fifty percent."[6] (Doc. 38 at Def's Ex. 19.) This increase in

---

[4] It is not clear from the record whether any of these documents are currently in evidence.

[5] On a motion for summary judgment, the Court must view all the facts in the light most favorable to the non-movant. *DeJulio v. Georgia*, 276 F.3d 1244, 1258 (11th Cir. 2001).

[6] NWSCC disputes Edwards' calculations.

students amounted to a "maddening" increase in the noise level and made the students "incomprehensible." (*Id*.)

Edwards also mentions in the letter his concerns regarding travel to the "Phil Campbell" campus. Because of his vision and ear problems, he keeps driving to a minimum. Apparently, Edwards had agreed to travel to the campus once a week, even though such travel constituted "a personal sacrifice due to motion sickness and vertigo caused by the inner ear injury." (*Id*.) However, he mentions in the letter, he reached this agreement because he believed he would then have "the weekend to recover from [his] travel-induced motion sickness."

To resolve these problems, Edwards suggested

> that things return to the way they had been before the fall semester began. My class load would be returned to its previous level (twenty students) and that I continue teaching exclusively at Muscle Shoals . . . .

(*Id*.) He adds

> [i]t is extraordinarily difficult to teach speech in a very large group where it is impossible for me to hear much of what the students are saying.

(*Id*.) Finally, Edwards concludes by requesting a meeting "as soon as possible to develop a plan for the remainder of the year and to develop a long-term solution to the problem. . . . Please call me as soon as possible to arrange a meeting to solve these problems." (*Id*.)

Around this same time, Edwards appears to have submitted a document from his physician recommending that Edwards' class size be limited to twenty students. (Doc. 24

at Ex. A.)

On December 13, 2005, near the end of the semester, Dr. Lee responded with a letter to Edwards offering several accommodations including: [7]

> [A] minimum of 25 students per course for speech classes.. . . I want to reiterate that this calls for keeping approximately 25 through the drop/add period. We will continue to monitor this number for future semesters.
>
> One of the original accommodations was to relieve you of traveling to the Phil Campbell Campus to teach two classes. The college would add one additional section on the Shoals Campus to provide you with a full load. You have indicated that you are willing to travel to Phil Campbell Spring Semester 2006 provided that the one additional class is added there (total of 3). This is not an option: traveling to Phil Campbell is acceptable but not adding an additional class. [sic]
>
> The college will look into moving the copying machine from outside your office or other corrective action to reduce noise.

(Doc. 38, Def.'s Ex. 20.)

Edwards followed up with a letter on February 6, 2006, to Dr. Roy Johnson Chancellor of the Alabama College System. (Doc. 38, Def.'s Ex. 23.) In that letter, Edwards indicates he wrote to the Chancellor on December 24, 2005, appealing the decision not to provide him with accommodations consistent with his physician's recommendation. Because no response had been received from the Chancellor, Edwards was uncertain whether the Chancellor had received the December letter.

On June 2006, Edwards filed an EEOC charge in which he complains about

---

[7] In the letter, Dr. Lee specifically refrained from taking a position on whether or not Edwards was disabled for purposes of the ADA.

increased class size, increased travel, and retaliation.  (Def.'s Ex. 9.)

### III.  ANALYSIS

A.  **State Law Disability Claim**:

Plaintiff brings a state law claim for disability discrimination pursuant to Alabama Code § 21-7-1 which provides:

> It is the policy of this state to encourage and enable the blind, the visually handicapped and the otherwise physically disabled to participate fully in the social and economic life of the state and to engage in remunerative employment.

Another provision of this same Chapter provides:

> It is the policy of this state that the blind, the visually handicapped and the otherwise physically disabled shall be employed in the state service, the service of the political subdivisions of the state, in the public schools and in all other employment supported in whole or in part by public funds on the same terms and conditions as the able-bodied, unless it is shown that the particular disability prevents the performance of the work involved.

Ala. Code § 21-7-8. [8]

NWSCC argues that Edwards may not pursue a private civil action for violation of these provisions found in Chapter 7 of the Alabama Code entitled "Rights Of Blind And Otherwise Physically Disabled Persons."  Ala. Code. §§ 21-7-1 through 21-7-10.  While a provision in Chapter 7 entitled "Penalty" specifies that violations relating to public

---

[8]  While Plaintiffs do not specifically cite to the latter provision in their complaint, this provision is found within the same chapter of the Alabama Code and provides more guidance regarding how the State's disability policy should be applied in the employment context.

facility access are punishable as a misdemeanor, Ala. Code § 21-7-5, no provision in the chapter explicitly permits civil claims. Under Alabama common law, "[o]ne claiming a private right of action within a statutory scheme must show clear evidence of a legislative intent to impose civil liability for a violation of the statute." *American Automobile Ass'n Co. v. McDonald*, 812 So. 2d 309, 311-12 (Ala. 2001).

Despite this high standard, the Alabama Court of Civil Appeals has implied that private civil actions are permissible under the Alabama disability statute. *See Mobile Firefighters Ass'n v. Personnel Bd. of Mobile County*, 720 So. 2d 932 (Ala. Civ. App. 1998).

B.  **Demand for Compensatory Damages Pursuant to the ADA**:

Although not raised by the parties, this Court notes that the United States Supreme Court recently held that the Eleventh Amendment prohibits private lawsuits against public entities for monetary damages pursuant to Title I of the ADA, which relates to discrimination in employment. *Board of Trustees v. Garrett*, 531 U.S. 356 (2001). Because NWSCC is a state public institution, Edwards' demand for compensatory damages under the ADA will be dismissed with prejudice.

C.  **ADA Timeliness:**

The Court finds that <u>all</u> of the events arising in the fall of 2005 are timely under the ADA, even though the reasonable accommodation discussions began a few months prior to the December 24, 2005, EEOC 180 day window. The law requires that

employees file EEOC charges "within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). The key terms in this provision are "after the alleged unlawful employment practice occurred." *See id*.

Here, the alleged unlawful employment practice actually occurred sometime between the December 24, 2005, letter to Chancellor Johnson and June 2006 when the charge was filed. Viewing the facts in the light most favorable to Edwards, on or around December 24, 2005, he sent a letter to Chancellor Johnson seeking an appeal of Dr. Lee's decision with respect to the proposed accommodations. Thus, on December 24, 2005, the beginning of the 180 day window, there is no evidence that a final decision had been reached with respect to Edwards' request for accommodations. Rather, Edwards was attempting one last effort to engage in the interactive process, as mandated by the ADA regulations:

> The determination of which accommodation is appropriate in a particular situation involves a process in which the employer and employee identify the precise limitations imposed by the disability and explore potential accommodations that would overcome those limitations. . . .
>
> The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability.

29 C.F.R. Pt. 1630.2(o) app.; 29 C.F.R. Pt. 1630.9 app.; *see* 29 C.F.R. § 1630.2(o)(3). A finding that Edwards' could not pursue the fall 2005 claims simply because the interactive process was <u>initiated</u> (not completed) outside the 180 day window would not serve the

purposes behind the ADA. Such a finding would only encourage employees to file lawsuits immediately, without giving employers a sufficient opportunity using "a flexible, interactive process" to resolve any accommodations problems. *See* 29 C.F.R. Pt. 1630.2(o) app.; 29 C.F.R. Pt. 1630.9 app.; 29 C.F.R. § 1630.2(o)(3)

D.      **ADA Substantive Provisions**:

>    The ADA prohibits certain employers, including the States, from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to . . . [the] terms, conditions, and privileges of employment. §§ 12112(a), 12111(2), (5), (7). To this end, the Act requires employers to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the employer's business." § 12112(b)(5)(A).

*Garrett,* 531 U.S. at 360-61.

In the present action, NWSCC argues that:

>    1)    Edwards is not disabled as defined by the ADA;

>    2)    NWSCC reasonably accommodated Edwards' disability; and

>    3)    Edwards' retaliation claim fails because he did not suffer a material adverse employment action, he cannot establish causation, and NWSCC had legitimate, non-discriminatory reasons for its actions.

1.  <u>Disability</u>:

The ADA defines "disability" to include a physical or mental impairment that <u>substantially limits</u> one or more of the major life activities of such individual. *See* 42 U.S.C. § 12111(8) (emphasis added). The

> term substantially limits means . . . [u]nable to perform a major life activty that the average person in the general population can perform [or] [s]ignificant restriction as to the condtion, manner or duration under which an individual can peform a particular major life activty as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(i).

NWSCC alleges that Edwards is not substantially limited in a major life activity, including eating, walking, talking, driving, exercising or working.

While Edwards admittedly can perform these tasks, a reasonable fact finder could determine that Edwards is substantially limited in one or more of these major life activities. He has difficulty walking and driving without getting nauseous. Not only is he unable to see well in low light, he sees multiple images. His vertigo causes him to fall more than the average person. He is unable to hear well when talking to persons with high-pitched voices and he is unable to "separate sounds." (Doc. 21 at Ex. 6, Edwards Dep. at 154-55.) Indeed, he indicated that the presence of more than twenty students in a classroom led to a "maddening" increase in the noise level and made the students "incomprehensible." (Doc. 38 at Def's Ex. 19.) Accordingly, summary judgment on this

issue will be denied.

    2.    <u>Reasonable Accommodations</u>:

NWSC claims that it reasonably accommodated Edwards by eliminating his class at the Phil Campbell campus and eliminating an "overload" schedule. Additionally, in its brief, NWSCC claims that "[p]laintiff admits these accommodations have allowed him to perform his job's essential duties." (Doc. 20, Def.'s Br. p. 17.) In support of this claim, NWSCCC cites pages 57 through 58 in Edwards' deposition.

Even a cursory reading of Edwards' deposition testimony, however, fails to support the claim made by NWSCC. When asked if he could perform the essential duties of his job, Edwards responded:

> But most of what they have said that are the so-called essential functions or characteristics of the instructor, I feel that <u>with appropriate circumstances</u> I can do.

(Doc. 21 at Ex. 6, Edwards Dep. at 58) (emphasis added). This statement hardly qualifies as an admission that the accommodations provided by NWSCC were sufficient.

Moreover, given the evidence in the record, this Court is unable to find that the accommodations offered by NWSCC were reasonable as a matter of law. Such is particularly the case in light of the physician's certificate indicating that Edwards' class size should be limited to twenty, along with Edwards' claims about the impact of the class size on his hearing. While NWSCC may be able to establish at trial that its proposed accommodations were reasonable and/or that Edwards' requested accommodations would

have caused an undue burden, the evidence at this juncture merely raises genuinely disputed issues of material fact.

    3.    <u>Retaliation</u>:

To establish a *prima facie* case for retaliation under the ADA, Edwards must show:

> (1) that he engaged in protected activity; (2) that he suffered an adverse employment action; and (3) a causal link between the protected activity and the adverse action. Opposing any act or activity that is made unlawful by the ADA is a "protected activity." The causation requirement is construed broadly, so that a plaintiff must only show the employer's awareness of a protected activity and a "close temporal proximity" between the awareness and the adverse decision.

*Novella v. Wal-mart Stores, Inc.*, 226 Fed. Appx. 901, 903 (11th Cir. 2007) (citations omitted).

NWSCC argues that Edwards cannot go forward with his retaliation claim for three reasons: (1) Edwards did not suffer an adverse employment action; (2) Edwards cannot establish causation; and (3) NWSCC purportedly had legitimate, non-discriminatory reasons for its conduct.

    a.    Adverse Employment Action

As NWSCC points out, the United States Supreme Court recently clarified what level of "materially adverse" conduct is actionable:

> a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

> We speak of <u>material</u> adversity because we believe it is important to separate significant from trivial harms . . . .

*Burlington Northern & Santa Fe RR Co. v. White*, 126 S. Ct. 2405, 2415 (2006) (emphasis in original).

The Court finds that Edwards has proffered sufficient evidence to meet this standard. While the increase in class size occurred prior to Edwards' Fall 2005 protected activity, once he sought accommodations and provided support from his physician, the administration still imposed a class size requirement inconsistent with the recommendation of a medical professional. Moreover, the administration warned Edwards that his class size could not drop below a specified level and that the administration would "monitor" the enrollment numbers "in future semesters." (Doc. 38, Def.'s Ex. 20.) Given his impairments, having his course load increased to the point where he found the students incomprehensible is more than a "trivial harm." *See id*. The increased class size, along with the warning about maintaining class size, might well have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*.

As the Supreme Court has noted with respect to the adverse employment action analysis,

> [w]e phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. . . . [F]or an "act that would be immaterial in some situations is material in others."

*Burlington Northern*, 126 S. Ct. at 2415-16 (citation omitted).

    B. Causal Connection/Temporal Proximity

Next, the Court finds that Edwards has established sufficient temporal proximity to survive summary judgment. Edwards met with Dr. Lee in the Fall of 2005 and memorialized their conversation in November via letter. The following month, Dr. Lee proposed the challenged accommodations discussed above. Around this same time, Edwards submitted medical support for the requested accommodations. However, his request was denied. Accordingly, Edwards has established "the employer's awareness of a protected activity and a 'close temporal proximity' between the awareness and the adverse decision." *See Wal-mart Stores*, 226 Fed. Appx. at 903.

    c. Legitimate Non-Discriminatory Reason

NWSCC also contends that Edwards has no evidence that the school's actions were retaliatory because the school had legitimate, non-discriminatory reasons for its actions. Indeed, according to NWSCC, the challenged conduct actually constituted reasonable accommodation; the school eliminated the requirement that Edwards travel to the Phil Campus and eliminated an "overload" class because it was scheduled for the Phil Campbell campus.

Edwards still complains about the class size requirement and the warning that he maintain this class size. NWSCC has not come forward with any evidence that it had a

legitimate, non-discriminatory reason for its response to the class size issue. Indeed, the blanket warning about maintaining a minimum enrollment might be considered retaliatory, particularly if students ultimately dropped the course for reasons unrelated to Edwards' performance.

Finally, NWSCC contends that Plaintiff has no evidence of Chancellor Johnson's motives and therefore, Plaintiff has no evidence of pretext. At this state of the proceedings Plaintiff is not required to come forward with "evidence" regarding Johnson's motives. It is enough that Plaintiff can establish a prima facie case for retaliation and that material issues of genuine fact exist regarding NWSCC's reasons for its response to the class size dispute. Accordingly, Edwards may go forward with his retaliation claim.

### IV. CONCLUSION

For the reasons discussed above, the Court finds that Edwards may go forward only with those state law claims associated with incidents that arose after October 20, 2004, and ADA claims arising out of events beginning in fall 2005. Additionally, Plaintiff's ADA claims for compensatory damages are due to be dismissed. However, Edwards may proceed to trial with his demand for other remedies under the ADA.

Done this 18th day of January, 2008.

_____
U.W. Clemon
United States District Judge